Randall H Davis, SBN 178404
Dun & Martinek LLP
2313 I Street (zip-95501)
P.O. Box 1266
Eureka, CA  95502
Telephone: (707) 442-3791
Facsimile: (707) 442-9251

Attorney for Defendant,
ROLAND LEROY RAYMOND

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>ROLAND LEROY RAYMOND,<br><br>　　　　Defendant. | Case No. CR 13-024 WHA (NJV)<br><br>DEFENDANT'S CLOSING BRIEF<br><br>Sentencing Hearing Date: January 13, 2014<br>Time: 10:00 a.m.<br>Court: Hon. William H. Alsup |

**<u>Introduction</u>**

At the conclusion of the evidentiary hearing held on December 23, 2013, the Court asked counsel to submit briefs regarding the testimony the Court heard that day.  Below is a summary of conclusions reached by Defendant regarding said testimony.

Prior to considering the testimony it is important to note at the outset the events that lead to the setting of the evidentiary hearing.  On November 5, 2013, when it appeared Defendant would not be sentenced on that date as previously scheduled, Defense counsel represented to the court that Defendant was getting assaulted again at the Santa Rita jail.  In light of that circumstance, Defendant sought to be placed on home arrest again or placed into a federal facility.  The request was made to avoid being assaulted again at Santa Rita, pending his eventual sentencing.

The Court denied Defendant's request to be moved from Santa Rita and ordered the U.S. Marshal to investigate Defendant's assertion that he was being assaulted. On November 8, 2013, Frank Conroy of the Marshal's office presented the Court with a sealed report. The conclusions reached by Mr. Conroy led the Court to wonder whether Defendant was attempting to "con" the Court.

As a result of the Court's concerns, it set an evidentiary hearing to determine whether or not the general assertions made through Defense counsel on November 5th were true or false. Mr. Raymond urges the Court to consider his testimony on December 23, 2013 to be a truthful explanation of the information Defense counsel was attempting to convey on his behalf on November 5, 2013.

## Summary of Testimony

By all accounts Roland Raymond has been assaulted at Santa Rita. The government apparently disputes the number of times he has been assaulted. Mr. Raymond testified that he had been assaulted on seven different occasions:



1. ███████████████████████████████████████
2. ██████████████████
3.    ████████████████████████████████████
4. █████████████████████████████████
5.    ██████████████████████████████████
6. ████████████████████████
7.    █████████████████████████████████
8. ████████████████████████████████████████
9. █████████████████████████████

Lauren Tucker, an employee of Santa Rita Jail, testified that she does not believe Mr. Raymond ██████████████████████████████████████. This was based on an "inquiry" she made as to whether or not Defendant has been housed properly.

The inquiry was comprised of determining if there were any records of Defendant being assaulted. She uncovered a report regarding the ████████████. After this assault, the jail transferred him to a different housing unit for his safety. On direct, she testified that any time an assault takes place, a report is generated. And since there was just the one report, she concluded that Mr. Raymond had not been assaulted on any other occasion.

 On cross-examination she admitted that not all assaults are reported. That Unit 34 is known as Thunderdome. Wiki defines Thunderdome as: "an arena for steel-cage jousting in the Australian post-apocalyptic film *Mad Max Beyond Thunderdome* (1985), directed by George Miller and George Ogilvie. It is also a euphemism for a contest where the loser suffers harsh consequences."

Ms. Tucker admitted that there are more fights in Unit 34 than any other minimum security housing unit. ████████████████████████████████████████████████████████████████████████ She also admitted that fights can go unreported at the facility. She said that inmates can tell a deputy about an incident to effectuate a transfer, but that they may lie about the reason why they want to get out of a housing unit. Ms. Tucker admitted that one of reasons why an inmate would not report an assault is to avoid negative consequences.

1    Ms. Tucker opines that Mr. Raymond was not the victim of an unreported assault because she has faith that her deputies are doing their jobs, i.e. that they walk through each housing unit once every hour and observe the inmates. According to her review of records, Mr. Raymond never showed any visible signs of being assaulted. Ms. Tucker admitted that she had not asked the deputies in charge of looking after Raymond about his health. Although not clear from her testimony, it appears one deputy is responsible for inspecting up to 300+ inmates, one time every hour of the day.

    Contrary to Ms. Tucker's testimony with regard to ▓▓▓▓, Defendant did have visible signs of being assaulted. See Corizon records attached to the government's brief. The examination records reflect that ▓▓▓▓. This is unequivocal evidence that ▓▓▓▓ Again this shows the differences in what actually happened in terms of the assault and the cursory record keeping by the jail. This is an important distinction.

    Ms. Tucker testified that each side of a housing unit can house a maximum of 164 inmates, which would mean each housing unit would hold a maximum of 328 inmates. She testified that there is a technician who sits in a booth that has a 360 degree view of the unit. She also testified that there is a minimum of one deputy assigned to each unit. She testified that there are cameras ▓▓▓▓.

    Frank Conroy caused a review of records at Santa Rita. ▓▓▓▓ This ignores the universal axiom of life in Santa Rita and prisons in this country. ▓▓▓▓

    What we are seeing is a disconnect between the internal records of a 4,000 person facility and the reality of one inmate's experiences in a gang-infested jail known to the inmates as the Thunderdome. The guards control the skeletal structure of the facility. The inmates control the inter-personal, internal structure of the facility on a minute-to-minute basis.

//

According to jail staff and their paperwork, Santa Rita is a carefully controlled environment where very little illegal activity can occur outside the watchful eyes of cameras and staff.  In reality, Santa Rita is a facility rife with assaultive behaviors, illegal alcohol and gang activity, all of which is carried out on a daily basis.  It is literally a minefield of danger, especially for an inmate like Defendant who is not ▇▇▇▇▇▇ can't hear very well and has very little experience navigating the nuances of ▇▇▇.

The culture at Santa Rita is well documented in a six part Discovery Channel program that can be viewed on YouTube.  Here is a link to part two of six of that program which describes life inside Santa Rita, Intake and Unit 34: http://youtu.be/zUr-JZfh9mA.  This video is valuable in that it corroborates many of the details described by Defendant in his testimony.  It also illustrates the type of violence that can occur in an Intake cell, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

The jail has their rules and procedures, but apart from that is a whole separate world or culture that is solely driven by inmate rules.  The motives behind those rules are power and profit.  They do not care about the safety or best interests of a loner, older man that has commissary ripe for the taking ▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Ms. Tucker testified that the transfer was the result of Defendant's unpaid gambling debt and the fear of retribution for said failure to pay.  How likely is it that the written jail record actually reflects the real reason for the transfer?  ▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇

1
2
3
4
5
6       At the hearing, Defendant has been accused by the government of essentially lying about a
7 hearing loss, and it has urged the Court to find this as evidence of Defendant's deceit ▮▮▮▮
8 ▮▮▮▮▮▮▮▮▮▮ Attached as Exhibit A, please see results of a hearing exam taken by Mr.
9 Raymond at Costco in July of 2013. Attached to that is a brief guide printed from the internet on how
10 to interpret the results. It is clear Mr. Raymond suffers from a severe hearing loss. In addition to this
11 report, his hearing deficit is corroborated by the Corizon medical report where he is seeking hearing
12 aids and batteries because he cannot hear out in the pod due to noises. (Note: this same Corizon report
13 corroborates ▮▮▮▮ in that it confirms Defendant requests prescription contact lenses, presumably
14 because he was missing one or both.)
15       The entire intent behind Mr. Raymond raising these issues to the Judge was to try and get
16 someone to place him ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ It was
17 **not** an attempt to lower the amount of time of his incarceration. It was simply to allow him to do his
18 time in a setting ▮▮▮▮▮▮▮▮▮▮ Now that his words have been misconstrued by
19 agencies that have a strong motive to portray a facility ▮▮▮▮▮▮▮▮ Mr. Raymond
20 feels like he has been defending his effort simply ▮▮▮▮▮▮▮▮.
21       Unfortunately, in many respects, his effort ▮▮▮▮ has detracted from the issue at
22 hand, which has been his sincere apology in doing something awful to the people he has been trying to
23 empower all of his professional life before succumbing to addiction.
24       Regarding Mr. Raymond's teeth, he has an implant where his front left tooth used to be. (See
25 attached dental report and receipts of implants attached hereto as Exhibit B) As with most implants, it
26 is intended to be permanent, as opposed to a denture that can be removed at any point in time. If an
27 implant is knocked out, then a person can take the implant (a false tooth with a screw sticking out of
28 the top) and attempt to insert it in the sleeve that once permanently housed the implant. This is what

Mr. Raymond had been doing with his displaced implant until the jail finally took it away from him. According to his dental records and the dentist's report submitted to this Court, Mr. Raymond really did have an implant, and it really did get dislodged from its permanent location.

What did not happen is what has been asserted by the Marshal's office. It asserts that Mr. Raymond has a denture for his front tooth and that he took it out to purposefully deceive the court. We point this out not to cast blame on the Marshal's office, but simply to point out that it is quite possible to get mixed up when it comes to dentures and implants.

Government finds troubling that Mr. Raymond left his implant on the 20th floor. The government's concern is misplaced. Defendant explained that his implant was no longer being held in place by anything and that it fell out while on the 20th floor. Even if he had taken it out on the 20th floor or taken it out in the courtroom, both are consistent with the fact that this implant is supposed to be permanent and not a denture. In other words, if this was a denture Mr. Conroy and Mr. Knapp's assertion of deception would make sense. The only reason to remove a denture in that instance would be to falsely claim that something permanent had been knocked out. We know from Defendant's testimony and the dental records, that Defendant did not have a denture. We can therefore conclude that Defendant was not attempting to deceive the Court.

Defendant had been holding onto the expensive implant with the hope that it could once again be made permanent. Unfortunately, the dental examiner opined that it was too damaged to be replaced as is. Also, as confirmed by Deputy Knapp, Defendant did not hide the existence of an implant from Deputy Knapp. He told them exactly what was essentially happening with that implant.

Mr. Raymond readily admitted his crimes. Lying to a Federal Judge is not one, and nothing about this evidentiary hearing should be used to enhance or, in the case of the prosecution, argue that his sentence should be increased. If anything, it should be noted that in addition to losing his freedom, he has been ███████████████ Although this is probably something about which his detractors might rejoice, it should definitely not be something that increases his sentence. Again, Mr. Raymond is not seeking to decrease his sentence as a result of it. He was merely trying to find a way ███████
███████████████████████████████████████████████████████████████████████████
███████████████

1   In any event, Mr. Raymond has admitted his crime, sincerely apologized to his victims (face-
2   to-face) in this court and is ready to do the time recommended by the government. ███████
3   ████████████████████████████████████████████████████████████████████████████████████
4   ██████████████████████ Increasing his sentence as a result of him reaching out to this court, no
5   matter how sloppily or imperfectly at times, could discourage future situations where an inmate may
6   choose to reach out for assistance.

7   Dated: January 6, 2014                Respectfully submitted,

                                          DUN & MARTINEK LLP

                                          / s /  RANDALL H DAVIS

                                          _____
                                          RANDALL H DAVIS
                                          Attorney for Roland Raymond

**EXHIBIT A**

Costco Hearing Aid Center 125
1006 West Wabash Ave
Eureka, CA   95501
Phone Number:   (707) 441 8457

Last Name         Raymond
First Name        Roland
Date of Birth
Address 1
ZIP Code, City
Home Phone        707-4443789

### Tone Audiometry

THR AC
Left: AC
Right: AC



**Right**   PTA: 43.30  AI: 25.74%

**Left**   PTA: 86.60  AI: 10.88%

Masking        AC        Masking
               BC

| | Right | | | | | Binaural/Dichotic | | | | | Left | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | AC | AC2 | BC | SF | Aided | AC | AC2 | BC | SF | Aided | AC | AC2 | BC | SF | Aided |
| SRT | | | | | | dB | | | | dB | | | | | |
| Mask | | | | | | dB | | | | dB | | | | | |
| SAT | | | | | | dB | | | | dB | | | | | |
| Mask | | | | | | dB | | | | dB | | | | | |
| WRS1 | | | | | | dB | | | | dB | | | | | |
| Mask | | | | | | dB | | | | dB | | | | | |
| Score | | | | | | % | | | | % | | | | | |
| WRS2 | | | | | | dB | | | | dB | | | | | |
| Mask | | | | | | dB | | | | dB | | | | | |
| Score | | | | | | % | | | | % | | | | | |
| WRS3 | | | | | | dB | | | | dB | | | | | |
| Mask | | | | | | dB | | | | dB | | | | | |
| Score | | | | | | % | | | | % | | | | | |
| MCL | | | | | | dB | | | | dB | | | | | |
| UCL | | | | | | dB | | | | dB | | | | | |

Date of Record:        7/8/2013 3:35:55 PM
Printed on: 7/8/2013 3:35:55 PM

Page 1



**JOHNS HOPKINS HEARING**

## Understanding Your Audiogram

The audiogram is a graphical display of the hearing test. The two main components that are graphed are frequency and intensity. These results are displayed for each ear. When you had your hearing tested, the audiologist was determining the softest sound you could hear at each specific frequency.



### Frequency
Frequency or pitch is measured in Hertz (Hz). Frequencies range from low-pitch to high-pitch and read from left to right on the audiogram. Each vertical line represents a different frequency. The ones used most often during testing are 250, 500, 1000, 2000, 4000 and 8000 Hz.

### Intensity
The intensity is measured in decibels (dB). The intensity relates to how loud or soft a sound is. Each horizontal line represents a different intensity level. The softest sounds are at the top of the chart and the loudest sounds at the bottom. Each mark on an individual's hearing test would represent the softest sounds they could hear. The softest intensity tested is typically 0 dB and the loudest is 120 dB.

### Right Ear - Left Ear
The right ear is graphed with either a circle or triangle when testing is performed using headphones. The left ear is graphed with an X or a square when headphones are used. These responses would all represent the air conduction results of either the right or left ear.

Another symbol used when testing is performed through the speakers or in the soundfield is S. This would represent the response of at least one ear or the response of the better hearing ear.

Other symbols seen on the audiogram may depict the responses obtained during bone conduction testing. The right ear is graphed with < or [ and the left ear with > or ]. These responses can help determine whether a hearing loss is sensorineural or conductive.

## Speech Testing

Speech discrimination or word recognition ability is scored as a percentage. This score represents how well a list of words could be repeated. The words are presented via headphones at a comfortable volume level with no background noise present.

## Degrees of Hearing Loss

Hearing loss is classified in degrees of hearing from normal to profound. This classification is determined by the hearing threshold (or the softest a sound was heard at a specific frequency).

| Classification of Hearing Loss | Hearing Threshold |
|---|---|
| Normal hearing | 0 to 20 dB |
| Mild | 21 to 40 dB |
| Moderate | 41 to 55 dB |
| Moderately-severe | 56 to 70 dB |
| Severe | 71 to 90 dB |
| Profound | 91+ dB |

**EXHIBIT B**

Patient: Roland Raymond　　　　　　　　　　　　　　　　　　　　　　　　　　SS#:
Birthdate:　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Chart #: RA0107

12/20/2013　11:54:04 AM　WONG　　　　　　Note Created On: 12/19/2013　7:19:56 PM
"-----------Thursday, December 19, 2013 at 7:20:00 PM-----------"

Patient Mr. Roland Rayloand presented at our office with chief concern "crown with the post came off from upper front tooth, and the adjacent front tooth was chipped.

Summary: Tooth #9 (upper left central incisor) was non-restorable due to internal root caries. Unable to recement post/ build up/ crown today due to blockage at root canal space . Recommend more comprehensive exam to determine restorative option. Intermediate treatment plan could be to extract #9. If patient desired a removable flipper, should consider extracting #10 (upper left central incisor) also due to poor prognosis of #10 .

Performed limited oral evaluation on upper anterior area and noted the following condition in adjacent area.

2. Tooth #7 (upper right lateral incisor) with defective filling with recurrent caries close to pulp/ nerve.
3. Tooth #8 (upper right central incisor) old filling missing with recurrent caries encroaching pulp nerve.
4. Tooth #10 (upper left lateral incisor) mobility with existing post/ crown with recurrent decay. Periapical radiolucency noted.
5. Tooth #11 (upper left canine) periapical radiolucency noted.

Addressing patient's concern--pt wanted to have #9 post/ build up/ crown recemented on to remaining root. Explained to patient the reason why the post/ build up/ crown came off was because of the root caries.. Due to extent of caries, tooth #9 was non-restorable.

Also noted blockage at root area when trying to determine if we could recement the bridge for temporary purpose. Explained to pt due to blockage at root level, there is nothing we could do to recement the post/ build up/ crown for him today.

Patient asked what can be done in the near future. Explained to patient Ideally he should have a comprehensive exam to address conditions of all his teeth. A temporary fllipper/ stayplate could be done after extraction of tooth #9 (#10 would also need extraction due to recurrent decay under crown/ Periapical lesion which give poor prognosis for tooth #10). Tooth #11's periapical lesion should also be addressed. #7. 8 will also need restorative treatment (root canal/ post buildup /crown) or other treatment depends upon on comprehensive exam findings.

Dr. P Wong

online at www.ameritasgroup.com.

AMERITAS LIFE INSURANCE CORP.
GROUP CLAIMS DEPARTMENT
P.O. BOX 82520
LINCOLN          NE  68501-2520

800-487-5553    (Toll-Free Number)
7am-Midnight M-Th, 7am-6:30pm (CT) Fri.

DATE:  4/07/2009
PAGE:  1 OF 1

www.ameritasgroup.com

E-mail Address: group@ameritas.com
(PLEASE INCLUDE CLAIM# 01-22-096-4971-0)

| No. | Date of Service | Proc Code | Pay Code | Service Description | Benefit Type | Submitted Charges | Covered Amount | Remark Code |
|---|---|---|---|---|---|---|---|---|
|    | 03/18/09 | D0330 |  | X-RAY, PANORAMI | PREV  | 125.00  | 97.00 | 70 |
| 04 | 03/18/09 | D6010 |  | IMPLANT         |       | 1950.00 | 0.00  | P9 |
|    | 03/18/09 | D9220 |  | GEN. ANESTHESI  | BASIC | 425.00  | 358.00 | 70 |

| Benefit Summary | | Submitted Charges | Covered Amount | Minus Deduct | Remain Amount | Coin % | Benefit Amount |
|---|---|---|---|---|---|---|---|
| TOTAL | PREV  | 125.00  | 97.00  | 0.00 | 97.00  | 100% | 97.00 |
| TOTAL | BASIC | 2375.00 | 358.00 | 0.00 | 358.00 | 80%  | 286.40 |
|       |       | 2500.00 | 455.00 |      | TOTAL PAYABLE | | 383.40 |
|       |       |         |        |      | PLAN PAYS     | | 383.40 |

PAYMENT WILL BE MADE TO YOUR DOCTOR                                383.40
BALANCE DUE TO YOUR DOCTOR UNLESS PREVIOUSLY PAID   ** THIS IS NOT A BILL **   2116.60

REMARKS:
If benefit amounts released were reduced due to coinsurance percentages or deductibles, you may
refer to the Schedule of Benefits in your certificate or policy for additional information.

Current Dental Terminology copyrighted American Dental Association.

70    CHARGE EXCEEDS PLAN ALLOWANCE. REFER TO "DENTAL/VISION EXPENSE BENEFITS"/
      "DENTAL/VISION BENEFITS AND GENERAL DEFINITIONS" IN YOUR POLICY OR
      CERTIFICATE BOOKLET.

P9    THIS PROCEDURE IS NOT INCLUDED AS A COVERED PROCEDURE IN YOUR PLAN. REFER
      TO THE "TABLE OF DENTAL PROCEDURES"/"DENTAL PROVISIONS"/"SCHEDULE" IN YOUR
      POLICY OR CERTIFICATE BOOKLET.

IF YOU BELIEVE THIS CLAIM HAS BEEN WRONGFULLY DENIED OR REJECTED YOU MAY HAVE THE MATTER REVIEWED BY:
    California Department of Insurance
    Claims Services Bureau, 11th Floor        Ph#:  800-927-HELP (Toll-Free In-State)
    300 South Spring Street, Los Angeles, CA  90013    213-897-8921 (Out-of-State)

NOTICE OF PROTECTED HEALTH INFORMATION PRIVACY PRACTICES
Additional copies of our Notice of Protected Health Information Privacy Practices are available
on our website at www.ameritasgroup.com or by contacting us at the address or telephone number
listed above.

PATIENT DEDUCTIBLE AND MAXIMUM INFORMATION:
YOUR REMAINING MAXIMUM FOR THE YEAR 2009 IS $1,075.40.

Plan Sponsor: YUROK TRIBE
Plan Member: ROLAND L RAYMOND
Patient    : ROLAND L RAYMOND

PERSONAL AND CONFIDENTIAL
ROLAND L RAYMOND

Claim No   : 01-22-096-4971-0
Source Code: ER25822K

Plan No : 0-25001-1    1
Provider: WENDELL N ROW

*William T. MARTEY*

GC 214 Rev. 4-03           Please retain this statement for tax purposes

## Claim for ROLAND L RAYMOND

#1   Claim number: 20120531422964

| PROCEDURE NUMBER AND TYPE OF SERVICE<br>TOOTH NUMBER AND SURFACE | SUBMITTED<br>FEE ($) | ACCEPTED<br>FEE ($) | MAXIMUM<br>CONTRACT<br>ALLOWANCE ($) | AMOUNT<br>APPLIED TO<br>DEDUCTIBLE ($) | PAID BY<br>ANOTHER<br>PLAN ($) | CONTRACT<br>BENEFIT<br>LEVEL | DELTA DENTAL<br>PAYS<br>($) | PATIENT<br>PAYS<br>($) |
|---|---|---|---|---|---|---|---|---|
| Date of service: November 29, 2011<br>(D6059) ABUTMENT SUPPORTED PORCELAIN FUSED TO METAL CROWN (HIGH NOBLE METAL) (IMPLANT)<br>Tooth: 04 | 1,400.00 | 1,400.00 | 1,400.00 | 0.00 | -- | 80% | 0.00 | 0.00 |

Treating provider: TIMOTHY M PENTECOST

▶ NOTE:  (9ND) Benefits could not be determined because of missing primary coverage information. Upon receipt of a new claim with a copy of the denial and/or payment notification from the primary carrier, we will process the submitted service(s) in accordance with our processing guidelines.
(ZZB) Our records indicate you have other insurance coverage. Your last claim submitted does not reflect this information and therefore your claim was denied. We depend upon your help in order for us to process your claims correctly. Please contact Delta Dental and update your primary insurance coverage; without your most current information your claim will continue to be denied.

| Claim total for ROLAND L RAYMOND | 1,400.00 | 1,400.00 | 1,400.00 | 0.00 | 0.00 | | 0.00 | 0.00 |

## Important Information

This Claim Statement is for services reported to Delta Dental of California by the dental office for the patient named on this form.

If your calculations differ from the amount indicated by Delta Dental, carefully read your Evidence of Coverage or Summary Plan Description and review the conditions which can affect the calculation of payment, such as deductibles, maximums, optional services and services provided by non-Delta Dental providers. If an adjustment has been made by Delta Dental, it will be explained on the notice. Any questions of ineligibility should be handled directly between you and your group.

If your claim has been denied or an adjustment has been made, you or your dental provider may make a request for review of your case to Delta Dental by calling or mailing such request to Delta Dental at the phone number or address indicated on page 1 of this notice. You should state the reasons for your request, include the ENROLLEE I.D. NUMBER and any additional information you have that would support your claim for benefits. You or your dental provider may request, free of charge, copies of any pertinent documents that are relevant to the claim. Upon request and free of charge, Delta Dental will provide you a copy of any internal rule, guideline, protocol, and/or explanation of the scientific or clinical judgment if relied upon in denying your claim. Certain cases may be referred to one of Delta Dental's regional consultants, to a review committee of the dental society in your area or to the state dental association for evaluation. You will receive a written decision on your request for review within 30 days (or 60 days if your group health plan is subject to the Employee Retirement Income Security Act of 1974 (ERISA)).

The review will take into account all information, regardless of whether such information was submitted or considered initially. The review shall be conducted for Delta Dental by a person who is neither the individual who made the original claim denial, nor the subordinate of such individual and Delta Dental will not afford deference to the initial decision. If the review of a claim denial is based in whole or in part on a lack of medical necessity, experimental treatment, or clinical judgment in applying the terms of the contract terms, Delta Dental shall consult with a dental provider who has appropriate training and experience. The identity of such dental consultant is available upon request. If you believe that you need further review of your claim and your group health plan is subject to ERISA, you may bring a civil action under section 502(a) of ERISA.